M. Anderson Berry (262879)
aberry@justice4you.com
Leslie Guillon (222400)
lguillon@justice4you.com
**CLAYEO C. ARNOLD,
A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 777-7777
Facsimile: (916) 924-1829

Mitchell R. Kreindler
(to be admitted *pro hac vice*)
Texas Bar No. 24033516
**KREINDLER & ASSOCIATES**
7676 Hillmont Street, Suite 240A
Houston, Texas 77040-6478
mkreindler@blowthewhistle.com
Telephone: 713.647.8888
Facsimile: 713.647.8889

*Attorneys for Plaintiff/Relator*

**FILED**

**Aug 04, 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

# SEALED

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **UNITED STATES OF AMERICA and STATE OF CALIFORNIA** *ex rel.* **CECILIA GUARDIOLA,** | Case No. _____ 2:20-cv-1558 KJM KJN |
| *Plaintiff,* | |
| *v.* | **COMPLAINT** |
| **OROVILLE HOSPITAL,** | |
| **OROHEALTH CORPORATION: A NONPROFIT HEALTHCARE SYSTEM,** and | **FILED UNDER SEAL PURSUANT TO THE FALSE CLAIMS ACT, 31 U.S.C. § 3730(b)(2)** |
| **ROBERT J. WENTZ,** | **JURY DEMANDED** |
| *Defendants.* | **SEALED** **DO NOT ENTER IN PACER** |

COMPLAINT (FCA)

1.      On behalf of the United States of America and State of California, plaintiff and relator Cecilia Guardiola files this *qui tam* complaint against defendants Oroville Hospital, OroHealth Corporation: A Nonprofit Healthcare System, and Robert J. Wentz (collectively, "Oroville") to recover damages resulting from the defendants' knowing efforts to defraud government-funded health insurance programs and private insurance companies through three schemes:

- Oroville falsely uses three categories of secondary diagnoses to impose Major Complications/Comorbidities (MCCs) and Complications/ Comorbidities (CCs) on patient care, resulting in significantly increased payments from government-funded health insurance programs and private insurers. The categories of secondary diagnoses used for this purpose by the defendants include: (1) severe and unspecified protein calorie malnutrition; (2) toxic encephalopathy, and (3) systemic inflammatory response syndrome of non-infectious origin with and without acute organ dysfunction.

- Oroville misuses the diagnosis of sepsis, resulting in the false billing of an entirely different, significantly more lucrative, diagnosis-related group (DRG).

- Defendants improperly bill for costly, unwarranted inpatient hospital admissions that last no more than one day, often driven by the false diagnoses described above.

Defendants' submission of false claims extends back to at least 2013 and continues to the present.

2.      Oroville's wrongdoing allows defendants to significantly increase the reimbursement they receive from Medicare, Medi-Cal, other government-funded health insurance programs and private insurers. As a result of their misconduct, defendants reap substantial and illicit profits at the expense of taxpayers and healthcare insurers.

**JURISDICTION AND VENUE**

3.      The Court has jurisdiction over the False Claims Act violations asserted in this action pursuant to both 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3730.

4.      The Court has supplemental jurisdiction over Relator's state law claims pursuant to 28 U.S.C. § 1367 because such claims are related to the False Claims Act allegations over which the Court exercises original jurisdiction.

5.      The Court has personal jurisdiction over defendants pursuant to 31 U.S.C.

§ 3732(a) because the False Claims Act authorizes nationwide service of process and defendants have sufficient minimum contacts with the United States.

6.     Venue is proper in this district pursuant to 31 U.S.C. § 3732(a) because the defendants can be found, reside or have transacted business in the Eastern District of California.

## INTRODUCTION

7.     This is an action to recover damages and civil penalties on behalf of the United States of America and State of California arising from false or fraudulent claims and statements made or caused to be made by the defendants to the United States and California in violation of the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.,* and the California False Claims Act ("CFCA"), Cal. Gov't Code §§ 12650*, et seq*., and for the purpose of obtaining compensation in violation of California's Insurance Fraud Prevention Act ("IFPA"), Cal. Ins. Code. § 1871, *et. seq.* The false or fraudulent claims, statements and records at issue involve payments made by government-funded health insurance programs, such as Medicare and Medi-Cal, and private insurers for services provided by the defendants.

8.     In general, the FCA and CFCA provide that any person who knowingly submits or causes to submit to the government a false or fraudulent claim for payment or approval is liable for a civil penalty for each such claim, plus three times the amount of damages sustained by the government.

9.     The IFPA provides that any entity violating, *inter alia*, the provisions of section 1871.7 or Penal Code sections 549 or 550 (which, in pertinent part, imposes criminal penalties for knowingly making or causing to be made any false or fraudulent claim for payment of a health care benefit) is subject "to a civil penalty of not less than five thousand dollars ($5,000) nor more than ten thousand dollars ($10,000), plus an assessment of not more than three times the amount of each claim for compensation." Cal. Ins. Code § 1871.7(b).

10.     The FCA, CFCA and IFPA empower private persons having information regarding a false or fraudulent claim to bring an action on behalf of the government and to share in the recovery. The complaint must be filed under seal without service on any defendant. The complaint remains under seal while the government conducts an investigation of the allegations

in the complaint and determines whether to join the action.

11.     Pursuant to the FCA, CFCA and IFPA, Relator seeks to recover on behalf of the United States and State of California damages and civil penalties arising from false and fraudulent claims, supported by false statements, that defendants submitted or caused to be submitted to government-funded and private health insurance programs.

## PARTIES

12.     Relator Cecilia Guardiola is a registered nurse, compliance professional and law school graduate with extensive nursing and compliance experience. She has worked extensively as a Clinical Documentation Improvement (CDI) specialist and consultant, working with hospitals and healthcare systems to review and improve clinical documentation. In that role, she has extensive experience ferreting out fraud in the way hospitals bill government-funded health insurance programs. Ms. Guardiola brings this action for violations of the FCA, CFCA and IFPA on behalf of herself and the United States, pursuant to 31 U.S.C. § 3730(b)(1), and the State of California, pursuant to Cal. Gov't Code § 12652(c) and Cal. Ins. Code § 1871.7(e)(1).

13.     Defendant Oroville Hospital, located in Oroville, California, is a short-term, acute care facility that provides a broad range of inpatient and outpatient services, primarily serving individuals in Butte County and the North Valley. It was founded in 1962, is incorporated in California as a non-profit corporation, and is a wholly-owned subsidiary of defendant OroHealth. Oroville Hospital employs more than 1,900 people, maintains 153 patient beds, and annually generates total patient revenue in excess of $900 million. The hospital has embarked on an expansion project that, when completed in 2022, will double the square footage of the hospital and increase the number of patient beds to 211.

14.     Defendant OroHealth Corporation: A Nonprofit Healthcare System ("OroHealth") is incorporated in California as a non-profit corporation with its principal place of business in Oroville, California. OroHealth has two subsidiaries: Oroville Hospital and OroLake Corporation, a California for-profit corporation that functions as a regional sales and service organization. It has the same corporate officers as defendant Oroville Hospital.

15.     Defendant Robert J. Wentz is President and Chief Executive Officer of both

1   defendant Oroville Hospital and defendant OroHealth. He has served in those positions at Oroville

2   Hospital since 1988 and, as a result, is responsible for the conduct described in this Complaint.

## BACKGROUND ALLEGATIONS

**Government-funded Health Insurance Programs**

5       16.     The defendants' wrongdoing was committed against government-funded and

6   private health insurance programs.

7       17.     Medicare is the primary target of defendants' fraud. It is a federally-funded health

8   insurance program created in 1965 when Title XVIII of the Social Security Act was adopted. 42

9   U.S.C. § 1395, *et seq.* Medicare has been expanded over time and currently provides coverage to

10  all people age 65 and over and to people under age 65 who have certain long-term disabilities or

11  suffer from End-Stage Renal Disease (ESRD). Medicare Part A, which is at issue here, provides

12  coverage for inpatient hospital services. *See* 42 U.S.C. §§ 1395c–1395i-5.

13      18.     Medicaid is also affected by defendants' fraud. Medicaid, which in California is

14  operated as Medi-Cal, is a jointly-funded State/Federal program that provides payment for

15  medical care for certain low-income individuals. 42 U.S.C. § 1396-1. Under the Medicaid

16  program, the delivery of medical services to eligible individuals is administered by the States

17  while the Federal government retains oversight and contributes matching funds for approved State

18  programs. 42 U.S.C. § 1396b. The Federal contribution is determined state-by-state and is the

19  result of a complicated statutory formula called the Federal Medical Assistance Percentage

20  (FMAP), which is based in part on the State's per capita income. 42 U.S.C. § 1396b(a). For 2020,

21  the Federal contribution to Medi-Cal is 50% of eligible expenditures.

22      19.     Medicare and Medicaid are administered by the federal government through the

23  Centers for Medicare & Medicaid Services (CMS). Medi-Cal is administered by the California

24  Department of Health Care Services (DHCS).

25      20.     Other government-funded health insurance programs were also likely affected by

26  defendants' fraud, including without limitation TRICARE and the Federal Employees Health

27  Benefit Program.

28

COMPLAINT (FCA)                    4

**Coding and Billing of Patient Claims**

21.     When submitted to Medicare for payment, outpatient procedures are classified and reported using CMS's Healthcare Common Procedure Coding System (HCPCS). This system is based primarily on *Current Procedural Terminology* (CPT), published by the American Medical Association. The CPT uses five-digit codes with descriptive terms to identify services performed by health care providers and is the country's most widely-accepted coding reference.

22.     Inpatient procedures are billed using a different system. For hospitals, there are several types of charges that are incorporated into the hospital bill, including facility and ancillary charges. Hospital facility charges consist of room, board and nursing care. Ancillary charges include radiology, laboratory, pharmacy and miscellaneous supplies.

23.     Inpatient hospital stays are also coded using a three-digit Medicare severity (MS) diagnosis-related group (DRG). The MS-DRG system was developed for Medicare as part of the inpatient prospective payment system (IPPS). It is used to classify hospital cases into one of approximately 500 groups based on the expectation that the cases use similar hospital resources. The MS-DRG charge is dependent upon the level of care that the patient requires, with higher intensity of care being reflected with a higher charge. The patient's level of care is, in part, determined by the procedures performed and diagnoses made while in the hospital. After October 1, 2015, such procedures and diagnoses are coded using a 4-digit number in the form xx.xx based on the International Classification of Diseases, Tenth Revision, Clinical Modification ("ICD-10") system, established by CMS and the National Center for Health Statistics. The MS-DRG payment is intended to be a single, all-encompassing payment covering all facility and ancillary charges, regardless of how long the patient is admitted or the number of services provided.

24.     Over time, DRG payments have evolved so that they are now adjusted based on a variety of factors, including a wage index to account for regional salary variations, medical education costs, cost outliers for cases with extremely high overall costs, and disproportionate share payments to hospitals that treat a large percentage of low-income patients. DRG payments may also be increased to hospitals that qualify as a sole community hospital, a Medicare-dependent rural hospital or a regional referral hospital.

25. Each DRG is assigned a payment weight that reflects the average resources used to treat Medicare patients in that DRG. The payment weight acts as a multiplier of the hospital's DRG payment, after it is augmented by the other factors described above. A DRG's payment weight is affected by the patient's diagnosis. Diagnoses are divided by CMS into the following three levels of severity:

| MCC | — | Major Complication/Comorbidity |
| CC | — | Complication/Comorbidity |
| Non-CC | — | Non-Complication/Comorbidity |

For the purposes of coding diagnoses on claims, a complication is a condition that arises during the hospital stay that prolongs the length of stay or requires additional resources to treat. A comorbidity is a pre-existing condition that affects the treatment provided, requiring increased resources and often prolonging the length of stay.

26. MCCs reflect the highest level of severity while Non-CCs reflect the lowest. These severity-augmented DRGs are known as Medicare Severity Diagnostic Related Groups or MS-DRGs. In general, the non-CC diagnosis codes do not significantly affect severity of illness or resource use while a CC or MCC has an impact on severity of illness and hospital resource use, resulting in a higher payment weight and increased payment to the hospital. By altering a patient's diagnosis — for instance, by changing a diagnosis of renal failure to renal failure with systemic inflammatory response syndrome (SIRS) — a hospital can increase its case mix index (*i.e.,* payment weight), change the MS-DRG and significantly increase the Medicare payment amount. In this case, defendants schemed to improperly increase the CC/MCC capture rates and, as a result, payments received for their Medicare claims. And because most non-government issuers largely follow Medicare coverage and coding guidelines, defendants' conduct also caused private insurers to pay excessive amounts.

27. Under Medi-Cal, since July 2013, claims for payment are submitted using a different system. California's Medicaid Management Information System uses the 3M™ All Patient Refined Diagnosis Related Group (APR-DRG) algorithm to assign a DRG to each claim. Hospitals are required to document accurately all diagnoses and procedures applicable to each claim, which leads to an APR-DRG assignment. Each DRG is assigned a relative weight, which

reflects a hospital's typical resources used for the level of care provided. This results in a DRG base rate that is used in the DRG payment calculation. The Medi-Cal DRG base rate is the same concept as the Medicare DRG standardized amount.  The DRG base rate is then adjusted for each hospital to reflect differences in local area wages, using the same approach and hospital-specific values as Medicare uses.

28.    Each DRG is also adjusted to reflect a level of severity, ranging from one to four (minor, moderate, major, or extreme). Severity depends on the number, nature and interaction of complications and comorbidities. The relative weight of the DRG generally increases as severity increases, resulting in a higher payment because the expected resource use is higher. As a result, Oroville's scheme to bill for increased patient severity — as evidenced by its improper use of secondary diagnosis codes and DRGs for Medicare patients — would be reflected in improper increases in Medi-Cal levels of severity.

**Services Must be Medically Necessary and Fully Documented**

29.    Medicare and Medi-Cal require, as a condition of coverage, that services be reasonable and medically necessary. 42 U.S.C. § 1395y(a)(1)(A); Cal. Welf. & Inst. Code § 14133.3. Providers must provide economical medical services and, then, provide such services only where medically necessary. 42 U.S.C. § 1320c-(a)(1). Providers must provide evidence that the service is medically necessary and appropriate, 42 U.S.C. § 1320c-5(a)(3) and Cal. Welf. & Inst. Code § 14133.3(a), and must ensure that services provided are not substantially in excess of patient needs, 42 U.S.C. § 1320a-7(b)(6), (8). Medi-Cal and private insurers have similar requirements.

30.    The Medicare Program Integrity Manual instructs Medicare Administrative Contractors (MACs) that, in order for a claim for inpatient care to be payable, a review of the medical record must indicate that inpatient hospital care was medically necessary, reasonable, and appropriate for the diagnosis and condition of the beneficiary at any time during the stay. CMS Medicare Program Integrity Manual § 6.5.2. Medi-Cal and private insurers have similar requirements.

31.    Federal law prohibits providers from making "any false statement or

COMPLAINT (FCA)                                   7

representation of a material fact in any application for any . . . payment under a Federal health care program." *See* 42 U.S.C. § 1320-a-7b(a)(1). Similarly, Federal law requires providers who discover material omissions or errors in claims submitted to Medicare to disclose those omissions or errors to the government. *See* 42 U.S.C. § 1320-a-7b(a)(3). The requirement that providers be truthful in submitting claims for reimbursement is a precondition for participation in the Medicare program. *See, e.g.*, 42 C.F.R. §§ 1003.105, 1003.102(a)(1)-(2).

32.     Federal law obligates every provider to return to the United States any payment that it improperly receives. It is a felony for an entity to conceal or fail to disclose errors in payments received from government-funded health insurance programs. 42 U.S.C. § 1320A-7b(a)(3).

33.     To participate in the Medicare program, health care providers enter into provider agreements with the Secretary of the U.S. Department of Health and Human Sevices (HHS). 42 U.S.C. § 1395cc. The provider agreement requires the provider to agree to conform to all applicable statutory and regulatory requirements for reimbursement from Medicare, including the provisions of Section 1862 of the Social Security Act and Title 42 of the Code of Federal Regulations.   As part of that agreement, an institutional provider must sign the following certification:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

Form CMS-855A.

34.     To participate in Medi-Cal, each provider must sign a provider agreement. 22 C.C.R. § 51000.45. The provider agreement requires the provider to agree to conform to all applicable statutory and regulatory requirements for reimbursement from Medi-Cal. The agreement provides:

AS   A   CONDITION   FOR   PARTICIPATION   OR   CONTINUED

COMPLAINT (FCA)                                   8

PARTICIPATION AS A PROVIDER IN THE MEDI-CAL PROGRAM, PROVIDER AGREES TO COMPLY WITH ALL OF THE FOLLOWING TERMS AND CONDITIONS, AND WITH ALL OF THE TERMS AND CONDITIONS INCLUDED ON ANY ATTACHMENT(S) HERETO, WHICH IS/ARE INCORPORATED HEREIN BY REFERENCE:

\* \* \*

2.    **Compliance With Laws and Regulations.** Provider agrees to comply with all applicable provisions of Chapters 7 and 8 of the Welfare and Institutions Code (commencing with Sections 14000 and 14200), and any applicable rules or regulations promulgated by DHCS pursuant to these Chapters. Provider further agrees that if it violates any of the provisions of Chapters 7 and 8 of the Welfare and Institutions Code, or any other regulations promulgated by DHCS pursuant to these Chapters, it may be subject to all sanctions or other remedies available to DHCS. Provider further agrees to comply with all federal laws and regulations governing and regulating Medicaid providers.

\* \* \*

16.    **Provider Fraud and Abuse.** Provider agrees that it shall not engage in or commit fraud or abuse. "Fraud" means an intentional deception or misrepresentation made by a person with the knowledge that the deception could result in some unauthorized benefit to himself or herself or some other person. It includes any act that constitutes fraud under applicable federal or state law. "Abuse" means either:  (1) practices that are inconsistent with sound fiscal or business practices and result in unnecessary cost to the Medicare program, the Medi-Cal program, another state's Medicaid program, or other health care programs operated, or financed in whole or in part, by the Federal Government or any state or local agency in this state or any other state; (2) practices that are inconsistent with sound medical practices and result in reimbursement by the Medi-Cal program or other health care programs operated, or financed in whole or in part, by the Federal Government or any state or local agency in this state or any other state, for services that are unnecessary or for substandard items or services that fail to meet professionally recognized standards for health care.

Form DHCS 6208 (Rev. 2/17).

35.    Hospitals are required to annually submit to the government a Medicare Cost Report. The Medicare Cost Report determines a provider's Medicare reimbursable costs for a fiscal year. 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. The cost report is the provider's final claim for payment from the Medicare program for the services rendered to all program beneficiaries for a fiscal year. Medicare relies on the Medicare Cost Report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare for the overpayment. 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

36.    Each Medicare Cost Report contains an express certification that must be signed

by the chief hospital administrator or a responsible designee of the administrator. The Medicare

Cost Report Certification provides the following prominent warning:

> MISREPRESENTATION OR FALSIFICATION OF ANY INFORMATION CONTAINED IN THIS COST REPORT MAY BE PUNISHABLE BY CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINE AND/OR IMPRISONMENT UNDER FEDERAL LAW. FURTHERMORE, IF SERVICES IDENTIFIED IN THIS REPORT WERE PROVIDED OR PROCURED THROUGH THE PAYMENT DIRECTLY OR INDIRECTLY OF A KICKBACK OR WERE OTHERWISE ILLEGAL, CRIMINAL, CIVIL AND ADMINISTRATIVE ACTION, FINES, AND/OR IMPRISONMENT MAY RESULT.

37.     This advisory is followed by this certification:

> CERTIFICATION BY CHIEF FINANCIAL OFFICER
> OR ADMINISTRATOR OF PROVIDER(S)
>
> I HEREBY CERTIFY that I have read the above certification statement and that I have examined the accompanying electronically filed or manually submitted cost report and submitted cost report and the Balance Sheet and Statement of Revenue and Expenses prepared by [Provider Name(s) and Number(s)] for the cost reporting period beginning [Date] and ending [Date] and to the best of my knowledge and belief, this report and statement are true, correct, complete and prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report were provided in compliance with such laws and regulations.

Medicare Cost Report, Form CMS-2552-10 (Part II).

38.     Upon information and belief, each defendant hospital executed and submitted a hospital cost report to Medicare annually which contained the certification in the preceding paragraph. The certifications were false in that the cost reports included inpatient days associated with paid inpatient claims that should have been billed as outpatient observation services or outpatient treatment, in violation of the Medicare law, regulations and Manual guidance regarding billing for inpatient services. These certifications were false also because the cost reports included improperly-paid inpatient claims reimbursed by Medicare, in violation of applicable laws, regulations and guidance governing billing for inpatient services.

**Specific Diagnoses and Patient Status Designations at Issue in this Case**

39.     By definition, a complication or comorbidity increases the risk of mortality and

resource consumption. As a small, community facility, Oroville Hospital exhibits excessive rates of CC/MCC capture for the diagnoses discussed in this Complaint that are inconsistent with its size and patient population. The CC/MCC capture rates are calculations that identify the number of DRGs billed with a CC or MCC compared to the total number of DRGs billed for the relevant time period. Whenever diagnosing a CC or MCC and its severity, verifiable objective supporting findings must be present in the medical record that will pass muster on professional audit. The medical record must identify all criteria and findings to substantiate the diagnostic determination.

40.     There are four types of diagnoses and one patient status that form the basis of defendants' fraudulent conduct: (1) severe and unspecified protein calorie malnutrition; (2) toxic encephalopathy, (3) systemic inflammatory response syndrome of non-infectious origin with and without acute organ dysfunction, (4) sepsis, and (5) inpatient status.

**Protein Calorie Malnutrition**

41.     "Malnutrition," when added as a secondary diagnosis, results in a substantially higher payment from Medicare. Improper use of malnutrition as a diagnosis can be avoided by using the term "nutritional deficiency" rather than "malnutrition" in the acute care setting. Several types of malnutrition are relevant to Relator's allegations.

42.     "Protein calorie malnutrition" (PCM) is a deficiency of macronutrients. Its severity ranges from subclinical deficiencies to obvious wasting to starvation and often impairs multiple organ systems. It is graded as mild, moderate, or severe. The severity is determined by calculating a patient's weight as a percentage of expected weight using international standards. Although PCM classifications are not precisely defined, patients who lose 10%-20% of their body weight without trying are usually said to have moderate PCM. Severe PCM usually requires that a patient's weight be less than 75% of the expected value.

43.     When added as a secondary diagnosis to an unrelated MS-DRG, malnutrition adds a CC or MCC that increases significantly the money received by a hospital for a patient's care. In this case, Relator alleges that defendants falsely coded patients with a secondary diagnosis of unspecified protein-calorie malnutrition (UPCM) (ICD-9 code 263.9; ICD-10 code E46), a CC, or other severe malnutrition/unspecified severe protein-calorie malnutrition (SPCM) (ICD-9 code

262; ICD-10 code E43), an MCC, to unrelated MS-DRGs.

44.     Relator alleges that defendants knowingly overused UPCM and SPCM as a secondary diagnosis to obtain higher payments from Medicare.

**Toxic Encephalopathy**

45.     "Encephalopathy" is used to describe any diffuse disease of the brain that alters brain function or structure. Encephalopathy may be caused by an infectious agent (bacteria, virus, or prion), metabolic or mitochondrial dysfunction, brain tumor, increased pressure in the skull, prolonged exposure to toxic substances (including solvents, drugs, radiation, paints, industrial chemicals, and certain metals), chronic progressive trauma, poor nutrition, or lack of oxygen or blood flow to the brain. The hallmark of encephalopathy is usually an altered mental state.

46.     Depending on the type and severity of encephalopathy, common neurological symptoms are progressive loss of memory and cognitive ability, subtle personality changes, inability to concentrate, lethargy, and progressive loss of consciousness. Other neurological symptoms may include myoclonus (involuntary twitching of a muscle or group of muscles), nystagmus (rapid, involuntary eye movement), tremor, muscle atrophy and weakness, dementia, seizures, and loss of ability to swallow or speak. Blood tests, spinal fluid examination, imaging studies, electroencephalograms, and similar diagnostic studies may be used to differentiate the various causes of encephalopathy.

47.     "Toxic encephalopathy" is used to describe an encephalopathic neurological disorder that results from exposure to neurotoxic substances, including solvents, radiation, paints, industrial chemicals, and certain metals. Causative agents can include heavy metals (such as manganese), aluminum, carbon monoxide, cyanide, ethanol, therapeutic drugs, environmental toxins (such as cyanotoxins found in shellfish), as well as alcohol and drugs (such as amphetamines and cocaine).

48.     Relator alleges that defendants falsely coded patients with a secondary diagnosis of toxic encephalopathy (ICD-9 code 349.82; ICD-10 code G92) to add this lucrative MCC.

**Systemic Inflammatory Response Syndrome**

49.     Systemic Inflammatory Response Syndrome (SIRS) is an exaggerated defense

response of the body to a noxious stressor (including infection, trauma, surgery, acute inflammation, ischemia or reperfusion, or malignancy) to localize and eliminate the source of the cause. It involves the release of acute-phase reactants --- inflammation markers --- which involve widespread endocrine, hematological and immunological alteration. Although the purpose is defensive, the impact of this exaggerate response has the potential to cause massive inflammatory cascade that can lead to organ dysfunction and even death. SIRS is characterized by abnormally high or low body temperature, high heart rate, high respiratory rate and a white blood count that is abnormally high or low.

50.    SIRS resulting from a noninfectious disease process is coded as a secondary diagnosis using one of two codes, depending on whether it is accompanied by an acute organ dysfunction (ICD-9 code 995.94; ICD-10 code R65.11, an MCC) or without organ dysfunction (ICD-9 code 995.93; ICD-10 code R65.10, a CC). When SIRS is caused by an infection, it is characterized as sepsis and billed as a different MS-DRG, not as a secondary diagnosis. As a result, almost all septic patients have SIRS, but not all SIRS patients are septic.

51.    When added as a secondary diagnosis to an unrelated MS-DRG, SIRS adds a CC or MCC that significantly increases the money received by a hospital for a patient's care. Relator alleges that defendants falsely coded patients with a secondary diagnosis of SIRS to increase the reimbursement received.

**Sepsis**

52.    Sepsis is a life-threatening organ dysfunction caused by a dysregulated response to infection. In septic shock, there is a critical reduction in blood flow to the tissue and organs resulting in the potential for failure of multiple organs.

53.    Because of its severity, sepsis is not often coded as a secondary diagnosis but as a separate DRG. Two MS-DRGs (871 and 872) are at issue in this case. MS-DRG 871 is defined as "severe sepsis with MCC without 96+ hours of mechanical ventilation." MS-DRG 872 is defined as "severe sepsis without major complication/comorbidity (MCC) without 96+ hours of mechanical ventilation."

54.    As noted above, sepsis incorporates SIRS brought about by infectious causes. As

COMPLAINT (FCA)                    13

a result, improper billing for SIRS and Sepsis is closely related.

55.     Relator alleges that defendants falsely coded patients as septic to significantly increase the amount paid by Medicare for claims to which the MS-DRGs were attached.

**Inpatient Status**

56.     Medicare defines an inpatient as a "person who has been admitted to a hospital for bed occupancy for purposes of receiving inpatient hospital services." *Medicare Benefit Policy Manual,* Ch.1, § 10. The patient's physician is "responsible for deciding whether the patient should be admitted as an inpatient." *Id.* Physicians may order an inpatient admission if they expect the patient will "require a hospital stay that crosses two midnights and the medical record supports that reasonable expectation." *Id.* This "2-Midnight Benchmark" creates a presumption that patients whose hospital stay spans at least two midnights are appropriately billed as inpatients.

57.     CMS recognizes that "the decision to admit is a complex medical judgment" requiring a physician to consider various factors such as "the patient's medical history and current medical needs," "[t]he severity of the signs and symptoms exhibited by the patient" and "[t]he medical predictability of something adverse happening to the patient." *Id.* Significantly, CMS notes that "[a]dmissions of particular patients are not covered or noncovered solely on the basis of the length of time the patient actually spends in the hospitals." *Id.* In particular, "when patients with known diagnoses enter a hospital for a specific minor surgical procedure or other treatment that is expected to keep them in the hospital for only a few hours (less than 24), they are considered outpatients for coverage purposes regardless of the hour they came to the hospital, whether they used a bed, and whether they remained in the hospital past midnight." *Id.*

58.     Inpatient status is generally not appropriate for hospital stays expected to last less than 2 midnights. If a stay is not reasonably expected to span at least two midnights, it is still permissible to treat the patient as an inpatient if:

- the procedure performed on the patient is on the list of "inpatient only" procedures;

- the procedure performed on the patient is a CMS-identified, national exception to the 2-Midnight Benchmark; or

- the admission otherwise qualifies for a case-by-case exception because the

COMPLAINT (FCA)                14

medical record documentation supports the admitting practitioner's judgment that the beneficiary required hospital care on an inpatient basis despite the lack of a two-midnight expectation.

59.     Medicare policy states that "stays under 24 hours would rarely qualify for an exception to the 2-midnight benchmark." CMS Medicare Program Integrity Manual §§ 6.5.2.A. and E.3.

60.     The inpatient claims data presented in this Complaint represents inpatient stays that lasted one day or less for procedures not enumerated on CMS's "inpatient only" list when the patient was normally discharged to his or her home (or home with home health).

## SPECIFIC ALLEGATIONS

### Ms. Guardiola Discovered Defendants' Wrongdoing

61.     Relying on her professional training, experience and expertise in clinical compliance and clinical documentation, Ms. Guardiola undertook a specialized and independent investigation into the Medicare billing practices of certain hospitals. She reviewed vast quantities of raw Medicare data, which she purchased through a private data provider, to detect clinical documentation improvement opportunities, assess complete and accurate coding, and ensure compliance. This data represents 100% of all Medicare fee-for-service inpatient prospective payment system (IPPS) claims for discharges during the twelve months ending September 30 for the period 2013 through 2019 (the latest year that such data was available). Ms. Guardiola identified fraudulent hospital billing and coding practices through focused clinical analysis and interpretation of benchmarking data to validate findings and measure patterns. She also developed operational profiles for the defendants, delving into their business model, leadership teams and physician services groups.

62.     Although Ms. Guardiola did not intend to focus on Oroville, her in-depth clinical analysis, professional expertise and experience in recognizing fraudulent billing patterns brought Oroville Hospital to her attention because of its inordinately high use of CC/MCCs as a secondary diagnosis, especially given its size and demographics. Using the techniques and data described in the preceding paragraph, Ms. Guardiola developed a historical perspective of defendants' billing patterns from 2013-2019, constantly honing her evaluation to identify trends and patterns in the

COMPLAINT (FCA)                    15

data.

63.     Ms. Guardiola then analyzed the data to identify the specific CC/MCCs that Oroville was capturing and the frequency of such billing. She observed that the CC/MCC capture rates at Oroville Hospital far exceeded the Medicare billing experience at the comparable, demographically-similar hospitals. She discovered that many of these CC/MCCs, that typically identify patients with the most severe conditions, were associated with patients whose hospital admissions lasted only one day. Her analysis resulted in the allegations enumerated in this Complaint.

64.     Ms. Guardiola also identified at Oroville Hospital excessive numbers of claims for sepsis due to atypical use of sepsis as a diagnosis for significant numbers of Medicare patients.

65.     Ms. Guardiola also discovered that Oroville Hospital had high numbers of short-stay inpatient admissions (those lasting less than 2 midnights), many of which were billed with a CC or MCC. By its clinical nature, an CC/MCC increases a patient's length-of-stay and resource consumption, which is why the MS-DRG reimbursement increases when a CC or MCC is captured. Because patients with CC/MCCs are among the sickest in the hospital, the unusual and significant number of CC/MCC-driven, short-stay inpatient admissions identified suspect claims.

66.     Based on her years of experience in mid-revenue cycle and hospital administration, Ms. Guardiola knows that usual billing patterns require significant commitment from physicians affiliated with the hospital. When she investigated physician relationships with Oroville, she observed unusual physician referral patterns.

67.     For example, Ms. Guardiola uncovered that hospitalists affiliated with Oroville Hospital are responsible for an inordinately large portion of inpatient stays at the hospital. Hospitalists are hospital-based general physicians that assume the care of hospitalized patients in the place of patients' primary care physicians. Oroville, upon information and belief, employs its hospitalists directly. As a result, Oroville exercises direct control over its hospitalists, and the hospitalists are dependent on the hospital for their continuing employment.

68.     Oroville's hospitalists are its top inpatient Medicare revenue generators. Hospitalists constitute the top 17 physician inpatient revenue generators for Oroville during 2019.

COMPLAINT (FCA)                        16

In 2019, the hospitalists accounted for over 97% of Oroville's revenue from inpatient Medicare stays and were responsible for much of the fraud described in this Complaint.

69.     For instance, according to Dexur, a healthcare news & research service, Oroville hospitalist Nhi Kash Vang, M.D., during 2015, was responsible for the most septicemia and severe sepsis discharges of any physician in the United States. His 182 discharges were 40 more than the next closest doctor. Only three physicians accounted for more than 100 septicemia and severe sepsis discharges during this same period. Dr. Vang continues to work at Oroville.

70.     The inordinately large treatment patterns illustrated in the preceding paragraphs suggest that Oroville's affiliated medical providers are responsible for an excessive percentage of inpatient admissions at Oroville Hospital. Upon information and belief, Ms. Guardiola alleges that these relationships constitute suspect referral relationships that Oroville uses to cause the fraudulent billing patterns alleged in this Complaint.

71.     As part of her evaluation of Oroville Hospital's propensity for attaching a specific CC/MCC to inpatient Medicare claims, Ms. Guardiola compared its billing practices to other hospitals' billing practices on a nationwide basis. Other than tracking national averages for hospitals' overall MCC capture rates, CMS does not release data showing CC capture rates or capture rates for specific CCs or MCCs. To establish national averages for individual MCC capture rates, Ms. Guardiola independently calculated national averages from the 2013 through 2019 universe of data used to generate the figures contained in this Complaint. Her analysis allowed her to determine the percentage of claims to which hospitals nationally, on average, attach CCs and MCCs for SPCM, UPCM, Toxic Encephalopathy and SIRS to inpatient Medicare claims. The calculated averages are reflected in this chart:

**Percentage of Inpatient Medicare Claims Across the U.S.
to Which Specified CC/MCC is Added**

| Year | SPCM | UPCM | ToxicEnceph | SIRS-MCC | SIRS-CC |
|------|------|------|-------------|----------|---------|
| 2013 | 1.1% | 0.7% | 1.0% | 0.4% | 0.4% |
| 2014 | 1.2% | 0.6% | 1.1% | 0.8% | 0.4% |
| 2015 | 1.3% | 0.6% | 1.2% | 0.8% | 0.4% |
| 2016 | 1.7% | 0.6% | 1.2% | 0.9% | 0.4% |
| 2017 | 2.0% | 0.5% | 1.2% | 0.9% | 0.4% |
| 2018 | 2.2% | 0.5% | 1.2% | 0.9% | 0.4% |
| 2019 | 2.4% | 0.5% | 1.3% | 0.8% | 0.3% |
| **Average** | **1.7%** | **0.6%** | **1.2%** | **0.8%** | **0.4%** |

72.     When comparing Oroville Hospital's tendency for attaching a specific MCC to an inpatient Medicare claim, the Complaint references a "national average" that is the overall average of seven years of Medicare data from 2013-19. Those national averages are reflected in the last line of the preceding chart.

**Oroville's False Claims**

73.     Ms. Guardiola's conclusions regarding the defendants' fraudulent billing schemes are conservative, in part due to CMS's data suppression policy. CMS's suppression policy aims to protect the confidentiality of Medicare and Medicaid beneficiaries by avoiding the release of information that potentially can be used to identify individuals. To accomplish that goal, CMS policy sets minimum thresholds for the display of CMS data. The policy stipulates that no data cell (e.g., admissions, discharges, patients, services, etc.) containing a value of 1 to 10 can be reported directly; however, a value of zero does not violate the minimum cell size policy. In addition, the use of percentages or other mathematical formulas that, in combination with other reported information, could result in the display of a cell containing a value of 1 to 10 is prohibited.

74.     Because CMS's suppression policy prevents the release of data showing fewer than 10 cases for a specific diagnosis code or MS-DRG, the data upon which Ms. Guardiola relies necessarily represents fewer than all available patient claims. This is particularly impactful for an institution like Oroville Hospital that is a relatively small facility, treating smaller numbers of patients, thereby potentially affecting it more significantly by application of the suppression policy.

COMPLAINT (FCA)                              18

75.     Application of the CMS suppression policy significantly undercounts the inpatient status fraud committed by Oroville. In the paragraphs that follow, Ms. Guardiola identifies for Oroville Hospital the number of inappropriate one-day inpatient admissions that have an MS-DRG billed with a CC or MCC. Because MS-DRGs with fewer than 10 claims are suppressed, many claims do not appear in the analysis.

76.     Oroville has defrauded Medicare by implementing the illicit billing strategies described above.

77.     For every year since at least 2013, inpatient claims that Oroville has submitted to Medicare have been accompanied by an MCC at rates that far exceed national averages. During 2013, hospitals nationally attached MCCs to 32.6% of their inpatient claims while Oroville attached MCCs to 47.9% of similar claims. By 2019, Oroville was attaching MCCs to a whopping 58% of its inpatient claims, while that national average had increased only to 42.6%. The following chart summarizes the percentage of inpatient claims to which Oroville attaches an MCC compared to the national average:



**Malnutrition**

78.     During 2019, Oroville added UPCM (ICD-10 code E46) and SPCM (ICD-10 code E43) as a secondary diagnosis to inpatient Medicare claims at the highest rate of any hospital in the country:

**2019 RATE AT WHICH HOSPITALS BILLED
UPCM AND SPCM AS A SECONDARY DIAGNOSIS ON
INPATIENT MEDICARE CLAIMS**

| # | Facility Name | % Capture |
|---|---|---|
| 1 | Oroville Hospital | 21.98% |
| 2 | *Saint Joseph Medical Center* | *17.59%* |
| 3 | Los Angeles Community Hospital | 11.15% |
| 4 | Paradise Valley Hospital | 9.20% |
| 5 | *Southern California Hospital at Hollywood* | *8.36%* |
| 6 | New York Presbyterian/Weill Cornell Medical Center | 8.31% |
| 7 | Centinela Hospital Medical Center | 8.29% |
| 8 | *Christian Hospital* | *7.60%* |
| 9 | *Moffitt Cancer Center* | *7.49%* |
| 10 | *Mayo Clinic Hospital in Florida* | *7.03%* |
| 11 | *Olympia Medical Center* | *6.99%* |
| 12 | *LA Downtown Medical Center Downtown Campus* | *6.96%* |
| 13 | UPMC Horizon - Greenville | 6.88% |
| 14 | *Barnes-Jewish Hospital* | *6.82%* |
| 15 | *Long Island Jewish Medical Center* | *6.56%* |

As the chart above demonstrates, during 2019, Oroville added UPCM and SPCM as a secondary diagnosis to almost 22% of its inpatient Medicare claims.

79.   Oroville's conduct during 2019 was no aberration. For the preceding six years (2013-18), Oroville added UPCM and SPCM to inpatient Medicare claims at the highest rate of any hospital in the country:

**2013-18 CAPTURE RATES FOR UPCM
AND SPCM AT TOP 2 HOSPITALS**

| Year | Oroville % Capture | Next Closest Hospital % Capture |
|------|--------------------|--------------------------------|
| 2018 | 27.75% | 14.86% |
| 2017 | 26.22% | 14.50% |
| 2016 | 25.89% | 11.59% |
| 2015 | 25.70% | 12.19% |
| 2014 | 24.75% | 9.10% |
| 2013 | 14.72% | 13.27% |

As this data demonstrates, Oroville was adding UPCM or SPCM as a secondary diagnosis to Medicare inpatient claims at a rate that, from 2014-19, was often more than double the rate of the hospital that was the next most prolific user of these diagnosis codes.

80.      From 2013-19, hospitals nationally attached Severe Protein Calorie Malnutrition to between 1.1% and 2.4 of their inpatient Medicare claims, but Oroville greatly exceeded this rate of capture in every year from 2013 to 2019:



During 2019, Oroville attached SPCM to a higher percentage of inpatient Medicare claims than all but 27 other hospitals in the United States.

81.      Oroville submitted thousands of false claims to Medicare for inpatient care to which a malnutrition MCC was attached improperly. In particular, as this chart demonstrates,

COMPLAINT (FCA)                    21

Oroville was paid by Medicare for hundreds of claims that were billed with an MCC for Severe Protein Calorie Malnutrition (ICD-9 code 262; ICD-10 code E43):



82.     From 2013-19, hospitals nationally attached Unspecified Protein Calorie Malnutrition to between 0.5% and 0.7% of their inpatient Medicare claims, but Oroville exponentially exceeded this rate of capture in every year from 2013 to 2019:



In fact, in every year from 2014-19, Oroville achieved the highest UPCM capture rate of any hospital in the United States. During 2013, it had the highest UPCM capture rate of all but two hospitals.

83.     Oroville submitted thousands of false claims to Medicare for inpatient care to

COMPLAINT (FCA)                             22

which a malnutrition CC was attached improperly. In particular, as this chart demonstrates, Oroville was paid by Medicare for hundreds of claims that were billed with a CC for Unspecified Protein Calorie Malnutrition (ICD-9 code 263.9; ICD-10 code E46):



**Toxic Encephalopathy**

84.    When added as a secondary diagnosis to an unrelated MS-DRG, toxic encephalopathy adds an MCC that increases significantly the money received by a hospital for a patient's care. During 2019, Oroville added toxic encephalopathy (ICD-9 code 349.82; ICD-10 code G92) as a secondary diagnosis to inpatient Medicare claims at the second highest rate of any hospital in the country:

### 2019 RATE AT WHICH HOSPITALS BILLED TOXIC ENCEPHALOPATHY AS A SECONDARY DIAGNOSIS ON INPATIENT MEDICARE CLAIMS

| # | Facility Name | % Capture |
|---|---|---|
| 1 | CHI St. Vincent Morrilton | 11.2% |
| 2 | Oroville Hospital | 8.1% |
| 3 | Mission Community Hospital | 7.8% |
| 4 | Saint Martin Hospital | 7.6% |
| 5 | Coast Plaza Hospital | 7.5% |
| 6 | Oviedo Medical Center | 6.4% |
| 7 | Salt Lake Regional Medical Center | 6.4% |
| 8 | Encino Hospital Medical Center | 6.0% |
| 9 | Community Howard Specialty Hospital | 5.9% |
| 10 | Garden City Hospital | 5.9% |

COMPLAINT (FCA)                    23

As the chart above demonstrates, during 2019, Oroville added Toxic Encephalopathy as a secondary diagnosis to over 8% of its inpatient Medicare claims.

85.    For the preceding six years (2013-18), Oroville remained among the nine most prolific users of Toxic Encephalopathy as a secondary diagnosis for inpatient Medicare claims:

**2013-18 OROVILLE HOSPITAL CAPTURE
RATES FOR TOXIC ENCEPHALOPATHY**

| Year | National Rank | % Capture |
|------|---------------|-----------|
| 2018 | 2 | 8.7% |
| 2017 | 2 | 8.6% |
| 2016 | 5 | 7.1% |
| 2015 | 1 | 8.4% |
| 2014 | 4 | 7.5% |
| 2013 | 8 | 5.8% |

86.    From 2013-19, hospitals nationally attached Toxic Encephalopathy to between 1.0% and 1.2% of their inpatient Medicare claims, but Oroville greatly exceeded this rate of capture during every one of those years:



From 2014-2019, Oroville was among the top five hospitals in the entire United States for the rate at which it attached Toxic Encephalopathy to inpatient Medicare claims in any year. During 2013, it ranked eighth in the nation in this category.

87.    Oroville submitted hundreds of false claims to Medicare for inpatient care to which

COMPLAINT (FCA)                    24

a toxic encephalopathy MCC was attached improperly:



**SIRS**

88.     During 2019, Oroville added SIRS as secondary diagnosis to inpatient Medicare claims, either as a CC (ICD-9 code 995.93; ICD-10 code R65.10) or MCC (ICD-9 code 995.94; ICD-10 code R65.11), at the highest rate of any hospital in the country and almost four times the rate of the hospital with next highest usage:

**2019 RATE AT WHICH HOSPITALS BILLED
SIRS (CC/MCC) AS A SECONDARY
DIAGNOSIS ON INPATIENT MEDICARE CLAIMS**

| # | Facility Name | % Capture |
|---|---|---|
| 1 | Oroville Hospital | 15.76% |
| 2 | Garden City Hospital | 4.58% |
| 3 | Saint Mary's Medical Center | 3.86% |
| 4 | CHI Health Lakeside | 2.37% |
| 5 | Advocate Trinity Hospital | 1.96% |
| 6 | Hazard ARH Regional Medical Center | 1.65% |
| 7 | UnityPoint Health - Methodist | 1.58% |
| 8 | Providence Medical Center | 1.51% |
| 9 | Southern Regional Medical Center | 1.37% |
| 10 | CHI Health Immanuel | 1.25% |

As the chart above demonstrates, during 2019, Oroville added SIRS as a secondary diagnosis to almost 16% of its inpatient Medicare claims, a rate that exceeded all other hospitals by a wide

margin.

89.     For the preceding six years (2013-18), Oroville added SIRS to inpatient Medicare claims at the highest rate of any hospital in the country:

### 2013-18 CAPTURE RATES FOR SIRS (CC/MCC) AT TOP 2 HOSPITALS

| Year | Oroville % Capture | Next Closest Hospital % Capture |
|------|------|------|
| 2018 | 15.48% | 3.79% |
| 2017 | 14.44% | 9.43% |
| 2016 | 16.37% | 7.87% |
| 2015 | 11.71% | 8.40% |
| 2014 | 5.72% | 2.56% |
| 2013 | 1.57% | 1.16% |

90.     From 2013-19, hospitals nationally attached the MCC SIRS with organ dysfunction (ICD-9 code 995.94; ICD-10 code R65.11) to between 0.4% and 0.9% of their inpatient Medicare claims, but Oroville exponentially exceeded this rate of capture in every one of those years:



91.     From 2015-19, Oroville attached MCC SIRS to a higher percentage of inpatient Medicare claims than every other hospital in the United States. Only one hospital exceeded Oroville's SIRS-MCC capture rate during 2014, and, during 2013, only seven hospitals exceeded

Oroville's rate.

92.    Oroville submitted hundreds of false claims to Medicare for inpatient care to which a SIRS MCC was attached improperly. In particular, as this chart demonstrates, Oroville was paid by Medicare for hundreds of claims that were billed with an MCC SIRS with organ dysfunction (ICD-9 code 995.94; ICD-10 code R65.11):



93.    From 2013-19, hospitals nationally attached the CC SIRS without organ dysfunction (ICD-9 code 995.93; ICD-10 code R65.10) to 0.4% of their inpatient Medicare claims, but Oroville exponentially exceeded this rate of capture in every one of those years:



COMPLAINT (FCA)                    27

In fact, in every year from 2012-19, Oroville was among the top three hospitals in the United States for highest SIRS CC capture rate.

94.     Oroville submitted hundreds of false claims to Medicare for inpatient care to which a SIRS CC was attached improperly. In particular, as this chart demonstrates, Oroville was paid by Medicare for hundreds of claims that were billed with an CC SIRS without organ dysfunction (ICD-9 code 995.93; ICD-10 code R65.10):



**Sepsis**

95.     By adding a principal diagnosis for sepsis to hundreds of inpatient claims, Oroville was able to inflate the amount paid by Medicare for numerous patients. In particular, the false principal diagnosis permitted Oroville to use two Sepsis DRGs to falsely bill Medicare for thousands of claims: MS-DRG 871 (septicemia w/o MV w/MCC) and MS-DRG 872 (septicemia w/o MV w/o MCC).

96.     Compared to all other California hospitals, Oroville added MS-DRG 871 to inpatient Medicare claims at the highest rate of any hospital (2017), a rate higher than all but five other hospitals (2018) and a rate higher than all but three other hospitals (2019). From 2017-19, Oroville added MS-DRG 872 to inpatient Medicare claims at the highest rate of any hospital in California.

97.     Using sepsis MS-DRG 871 (septicemia w/o MV w/MCC), Oroville falsely billed Medicare for thousands of claims every year since 2013:



During 2017, Oroville billed more claims using MS-DRG 871 than any other hospital in California. During 2018-19, Oroville billed more claims using MS-DRG 871 than other hospital in California, except Cedars-Sinai Medical Center in Los Angeles, which has more than five times as many beds as Oroville and had a capture rate that was more than four times less than Oroville's (2019: 7.4% vs. 28.3%; 2018: 8.0% vs. 27.8%).

      98.    Using sepsis MS-DRG 872 (septicemia w/o MV w/o MCC), Oroville falsely billed Medicare for thousands of claims every year since 2013:



During 2017-19, Oroville billed more claims using MS-DRG 872 than any other hospital in California.

      99.    While these figures demonstrate that Oroville was submitting false claims for

COMPLAINT (FCA)               29

Sepsis (MS-DRGs 871 and 872), Oroville's wrongdoing is also evidenced by the relative lack of severity of its septic patients. Oroville hospitalized patients who were diagnosed as septic (MS-DRGs 871 and 872) for the shortest amount of time of any hospital in the United States. From 2014-19, Oroville led the nation in septic patients who spent two days or fewer in the hospital but were diagnosed as septic (MS-DRGs 871 and 872). In Ms. Guardiola's clinical experience, a hospital, such as Oroville, is committing Medicare fraud when it is diagnosing a high volume of patients with a life-threatening condition like sepsis but keeping those patients in the hospital for a relatively short time.

### Short-stay inpatient claims.

100.   Oroville received payment from short-stay inpatient claims that lasted no more than one day. Such claims would rarely qualify for an exception to Medicare's 2-midnight benchmark. From 2014-19, Oroville billed Medicare for at least 1,192 inpatient stays that lasted only one day. Moreover, a significant percentage of such one-day stays also included billing of an MCC:

| Year | # of Short-Stay 1-day Claims | # billed with MCC | % billed with MCC |
|---|---|---|---|
| 2014 | 183 | 49 | 26.8% |
| 2015 | 137 | 58 | 42.3% |
| 2016 | 211 | 50 | 23.7% |
| 2017 | 238 | 85 | 35.7% |
| 2018 | 262 | 68 | 25.9% |
| 2019 | 161 | 71 | 44.1% |
| **Total** | **1192** | **411** | **34.5%** |

A significant number of short-stay inpatient claims that fail to meet the 2-midnight benchmark are, in and of themselves, indicative of fraudulent billing. Because a third of those stays also included an MCC — representing patients with the most severe conditions — the fraudulent nature of these claims is even more evident. Ms. Guardiola alleges based on her knowledge and clinical experience that Oroville submitted to Medicare at least 1,192 false claims for short-stay inpatient claims.

**Defendants' Continuing Conduct and Impact on Private Insurers**

101.   As set forth above, from at least 2013 through 2019, Oroville engaged in a widespread practice of knowingly submitting false claims to Medicare by improperly using secondary diagnoses, misusing the diagnosis of sepsis, and generating unwarranted short-stay, inpatient hospital admissions.

102.   Although the data underlying Ms. Guardiola's allegations comes from Medicare, it is Ms. Guardiola's professional experience that such systemic fraud will apply equally to claims submitted by defendants to all government-funded health insurance programs and private insurers. This is because, in Ms. Guardiola's experience, hospital systems are designed to apply across all similar types of patient claims and are not designed to implement wholesale changes on an insurer-by-insurer basis. Oroville receives a significant amount of revenue from Medi-Cal and private insurance companies. Of the over $900 million in gross patient revenue that Oroville generated during 2018, almost $327 million — over 36% — was paid by Medi-Cal and an additional $266 million — over 29% — was paid by insurers other than Medicare. While some of those funds may have been paid by other government-funded health insurance programs, like TRICARE and the Federal Employees Health Benefit Program, in Ms. Guardiola's experience most of the $266 million would have come from private insurance. Based on Ms. Guardiola's knowledge of hospital billing systems and because a significant portion of Oroville's patient population is covered by Medi-Cal and private insurance, Ms. Guardiola reasonably alleges, upon information and belief, that defendants submitted false claims to improperly receive compensation from Medi-Cal, other government-funded health insurance programs, and private insurance companies using the schemes described above.

103.   While the details of these schemes are within the possession and control of the defendants, Ms. Guardiola asserts upon information and belief that the False Claims Act violations alleged in this Complaint are continuing to the present. Her allegation that defendants' violations are continuing is reasonably based on the detailed factual analysis she has performed in formulating her allegations and her expertise and experience in understanding the mechanisms underlying hospital billing patterns. Based on defendants' years of unusual billing patterns and

COMPLAINT (FCA)                               31

business model reflected in its physician referral patterns, *see* paragraphs 66-68 *supra*, Ms. Guardiola plausibly infers that defendants' submission of false claims represents an ongoing practice. Data for years beyond 2019 and discovery from defendants will support and demonstrate the continuing nature of their wrongdoing.

104.    As a result of their false claims, defendants have grabbed taxpayer and private money that they are not entitled to receive, and the United States, State of California and private insurance companies have been defrauded and continue to be defrauded every day, improperly paying millions of dollars in unnecessary healthcare costs.

### COUNT ONE
### False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

105.    Relator re-alleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

106.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

107.    By virtue of the acts described above, the defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the United State.

108.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the United State in order to induce payment of false or fraudulent claims.

109.    The United States, unaware of the defendants' wrongdoing or the falsity of the records, statements, certifications or claims made by the defendants or the defendants' wrongdoing, paid claims that would not otherwise have been allowed.

110.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

**COUNT TWO**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(B)**

111.    Relator re-alleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

112.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

113.    By virtue of the acts described above, the defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid by the United States.

114.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the United States in order to induce payment of their false or fraudulent claims.

115.    The United States, unaware of the defendants' wrongdoing or the falsity of the records, statements, certifications or claims made by the defendants or defendants' wrongdoing, paid claims that would not otherwise have been allowed.

116.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

**COUNT THREE**
**False Claims Act**
**31 U.S.C. § 3729(a)(1)(G)**

117.    Relator re-alleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

118.    This is a claim for treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729, *et seq*., as amended.

119.    By virtue of the acts described above, the defendants knowingly concealed an obligation to pay or transmit money to the United States.

120.    By virtue of the acts described above, the defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money to the United States.

121.    By virtue of the acts described above, the defendants knowingly concealed the

existence of their improper conduct from the United States in order to conceal and retain payments received as a result of their violations of the Act.

122.    The United States, unaware of the defendants' wrongdoing or the falsity of the records, statements, certifications or claims made by the defendants or the defendants' wrongdoing, paid claims that would not otherwise have been allowed.

123.    By reason of these payments, the United States has been damaged, and continues to be damaged, in substantial amount.

## COUNT FOUR
## CALIFORNIA FALSE CLAIMS ACT
### Cal. Gov't Code §§ 12651(a)(1)

124.    Relator re-alleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

125.    This is a claim for treble damages and penalties made under the California False Claims Act.

126.    By virtue of the acts described above, defendants knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval to the State of California for payment or approval.

127.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the State of California in order to induce payment of false or fraudulent claims.

128.    The State of California, unaware of the defendants' wrongdoing or the falsity of the records, statements, certifications or claims made by the defendants or the defendants' wrongdoing, paid claims that would not otherwise have been allowed.

129.    By reason of the defendants' acts, the State of California has been damaged, and continues to be damaged, in a substantial amount.

## COUNT FIVE
## CALIFORNIA FALSE CLAIMS ACT
### Cal. Gov't Code §§ 12651(a)(2)

130.    Relator re-alleges and incorporates by reference the allegations contained in all

previous paragraphs as if fully stated in this Count.

131.    This is a claim for treble damages and civil penalties under the California False Claims Act.

132.    By virtue of the acts described above, the defendants knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid by the State of California.

133.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the State of California in order to induce payment of their false or fraudulent claims.

134.    The State of California, unaware of the defendants' wrongdoing or the falsity of the records, statements, certifications or claims made by the defendants or defendants' wrongdoing, paid claims that would not otherwise have been allowed.

135.    By reason of these payments, the State of California has been damaged, and continues to be damaged, in substantial amount.

### COUNT SIX
### CALIFORNIA FALSE CLAIMS ACT
#### Cal. Gov't Code §§ 12651(a)(7)

136.    Relator re-alleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

137.    This is a claim for treble damages and civil penalties under the California False Claims Act.

138.    By virtue of the acts described above, the defendants knowingly concealed an obligation to pay or transmit money to the State of California.

139.    By virtue of the acts described above, the defendants knowingly and improperly avoided or decreased an obligation to pay or transmit money to the State of California.

140.    By virtue of the acts described above, the defendants knowingly concealed the existence of their improper conduct from the State of California in order to conceal and retain payments received as a result of their violations of the Act.

141.    The State of California, unaware of the defendants' wrongdoing or the falsity of the records, statements, certifications or claims made by the defendants or the defendants' wrongdoing, paid claims that would not otherwise have been allowed.

142.    By reason of these payments, the State of California has been damaged, and continues to be damaged, in substantial amount.

### COUNT SEVEN
### California Insurance Frauds Prevention Act
### Cal. Ins. Code § 1871.4(a)(1)

143.    Relator re-alleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

144.    This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act.

145.    By virtue of the acts described above, defendants made or caused to be made a knowingly false or fraudulent material statement or material representation for the purpose of obtaining any compensation, from private health insurance companies operating in the State of California in violation of each patient's private health insurance contract.

146.    By virtue of the acts described above, defendants made or caused to be made a knowingly false or fraudulent material statement or material representation to induce the private health insurance companies in California, or for patients in California covered by those insurers, to approve or pay false and fraudulent claims. This conduct violated, *inter alia*, California Penal Code sections 549 and 550.

147.    Private insurance companies in California, or those insurers that covered patients in California, unaware of the falsity of the records, statements, and claims made, used, presented, or caused to be presented by defendants, paid and continue to pay the claims that would not be paid but for defendants' illegal conduct.

148.    By reason of the defendants' acts, private health insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

149.    By reason of the defendants' acts, the State of California has also been damaged,

COMPLAINT (FCA)                           36

and continues to be damaged, in a substantial amount to be determined at trial.

**COUNT EIGHT**
**California Insurance Frauds Prevention Act**
**Cal. Ins. Code § 1871.4(a)(2)**

150. Relator re-alleges and incorporates by reference the allegations contained in all previous paragraphs as if fully stated in this Count.

151. This is a claim for treble damages and penalties under the California Insurance Frauds Prevention Act.

152. By virtue of the acts described above, defendants presented or caused to be presented a knowingly false or fraudulent written or oral material statement in support of a claim for compensation for the purpose of obtaining any compensation for claims submitted to private health insurance companies operating in the State of California for payment or approval in violation of each patient's private health insurance contract.

153. By virtue of the acts described above, defendants presented or caused to be presented a knowingly false or fraudulent written or oral material statement in support of a claim for compensation to induce the private health insurance companies in California, or for patients in California covered by those insurers, to approve or pay false and fraudulent claims. This conduct violated, *inter alia*, California Penal Code sections 549 and 550.

154. Private insurance companies in California, or those insurers that covered patients in California, unaware of the false or fraudulent written or oral material statement in support of a claim for compensation, and claims made, used, presented, or caused to be presented by defendants, paid and continue to pay the claims that would not be paid but for defendants' illegal conduct.

155. By reason of the defendants' acts, these private health insurance companies have been damaged, and continue to be damaged, in a substantial amount to be determined at trial.

156. By reason of the defendants' acts, the State of California has also been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

COMPLAINT (FCA)                    37

WHEREFORE, Relator requests that judgment be entered in favor of the United States and relator against the defendants, ordering that:

a.       the defendants cease and desist from violating the FCA, 31 U.S.C. § 3729, *et seq*., CFCA, Cal. Gov't Code § 12650*, et seq*., and the IFPA, Cal. Ins. Code. § 1871, *et. seq.;*

b.       the defendants pay an amount equal to three times the amount of damages sustained by the United States, State of California and private insurance companies, directly or indirectly, as a result of defendants' unlawful acts, pursuant to 31 U.S.C. § 3729(a)(1), Cal. Gov't Code § 12651(a), and Cal. Ins. Code § 1871.7.

c.       the defendants pay the maximum civil penalty each false claim or unlawful act as provided by 31 U.S.C. § 3729(a)(1), as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 (*see* 28 C.F.R. § 85.5), Cal. Gov't Code § 12651(a), and Cal. Ins. Code section 1871.7;

d.       Relator be awarded the maximum amount allowed pursuant to the FCA, 31 U.S.C. § 3730(d), Cal. Gov't Code § 12652(g)(2), and California Insurance Code § 1871.7;

e.       Relator be awarded all costs of this action, including attorneys' fees and costs pursuant to the FCA, 31 U.S.C. § 3730(d), Cal. Gov't Code § 12652(g)(8), and California Insurance Code § 1871.7; and

f.       the United States and Relator recover such other relief as the Court deems just and proper.

//
//
//
//
//
//

1

**REQUEST FOR TRIAL BY JURY**

2

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, relator hereby demands a

3

trial by jury.

4

Date: August 4, 2020                    Respectfully submitted,

5

6

By:    _/s/ M. Anderson Berry_____

7

M. ANDERSON BERRY
aberry@justice4you.com

8

LESLIE GUILLON
lguillon@justice4you.com

9

**CLAYEO C. ARNOLD,**
**A PROFESSIONAL LAW CORP.**

10

865 Howe Avenue
Sacramento, CA 95825

11

Telephone: (916) 777-7777
Facsimile: (916) 924-1829

12

13

Mitchell R. Kreindler
(to be admitted *pro hac vice*)

14

Texas Bar No. 24033518

15

**KREINDLER & ASSOCIATES**
7676 Hillmont Street, Suite 240A

16

Houston, Texas 77040-6478
mkreindler@blowthewhistle.com

17

Telephone: 713.647.8888
Facsimile: 713.647.8889

18

ATTORNEYS FOR *QUI TAM*

19

RELATOR CECILIA GUARDIOLA

20

21

22

23

24

25

26

27

28

COMPLAINT (FCA)                    39